IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

KAREN J. CURTIS, Individually
as the Surviving Spouse of Dr.
Jeffrey Van Curtis, and ROBERT
RUPENTHAL, Administrator with
Will Annexed of the Estate of Dr.
Jeffrey Van Curtis,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

CIVIL ACTION FILE

NUMBER 3:15-cv-176-TCB

## O R D E R

On February 22, 2014, Jeffrey Van Curtis was killed in an

airplane crash at the LaGrange-Callaway Airport in LaGrange,

Georgia. Curtis's widow, Plaintiff Karen J. Curtis, and the

administrator of his estate, Plaintiff Robert Rupenthal, brought this

lawsuit against the United States of America pursuant to the Federal

Tort Claims Act ("FTCA"). Plaintiffs allege that negligence by the Civil

Air Patrol—a United States Air Force Auxiliary—caused the crash that

killed Curtis and fellow passengers Michael Rossetti and Willy Lutz.

Beginning on March 13, 2017, the Court presided over a six-day bench trial, and on June 16 the parties submitted their proposed findings of fact and conclusions of law [225 & 226].

After reviewing the parties' submissions, independently examining and considering the testimony and evidence of record, and weighing the credibility of the witnesses, the Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.    Findings of Fact

### A.    Dr. Curtis's Background

Curtis was a fifty-three-year-old family doctor. He lived in Peachtree City, Georgia, with his wife of twenty-one years, Karen, and their two school-aged children, Alec and Olivia. By all accounts he was a loving and dedicated husband and father and respected doctor in the community. He was an avid outdoorsman who regularly enjoyed deep-

sea fishing, hunting, and skiing with his family. Tr. 199:10 – 200:2;

440:22 – 441:1; 441:15 – 442:13.[1]

Curtis was a "self-made man" who operated his own medical

practice. Tr. 731:13-18. His practice was a fixture in the community,

and he regularly provided care for his extended network of friends and

neighbors. Tr. 122:6-14. In 2014, he negotiated a sale of his practice to

Emory Healthcare as part of a profit-sharing agreement. Tr. 198:1-17;

654:17 – 655:6. Curtis continued to see patients until his death in 2014.

## B.   The Baron

Curtis was part-owner of a Beechcraft Baron 95-B55 airplane (the

"Baron"). He was a licensed pilot and had extensive experience flying

the Baron. He flew regularly and encouraged his teenage son Alec to

pursue his own pilot's license. Tr. 433:22 – 434:114.

Curtis often took his family members and friends as passengers

for flights in the Baron. Karen and Alec Curtis both testified that they

had flown in the Baron on multiple occasions, and that Curtis was

---

[1] The trial transcript is filed on the docket in six volumes. *See* [227] to [232]. Those volumes use a single continuous page count, so for simplicity the Court will refer only to the transcript page number, rather than the particular docket entry number.

particularly serious about airplane maintenance and safety. Tr. 443:2-13; 733:21 – 734:14.

The Baron was equipped with a lift detector that was designed to warn the pilot with an audible horn if the plane was about to lose lift, meaning it could not sustain flight. Tr. 118:9-20. Karen Curtis and family friend James Wisner testified that during previous flights in the Baron they had heard the lift detector horn when the Baron was landing.[2] Tr. 376:14 – 377:24; 734:15 – 735:8.

Van Thaxton, an airplane mechanic, regularly serviced the Baron. As part of annual maintenance, he performed FAA-mandated inspections, which included testing the lift detector. Thaxton found that the lift detector functioned properly during all annual inspections. Tr. 121:1-15; 124:8 – 127:1. One week before the crash, Thaxton checked the Baron's batteries and washed the airplane. On the morning of the crash, he pulled the Baron out of its storage hangar so that it could be

---

[2] It is normal for a lift detector to sound when a plane lands, as the lift detector indicates when the plane will soon lose the ability to maintain flight. *See* Tr. 544:15 – 545:17; 553:18-20.

prepared for flight, and found the plane to be in normal working order. Tr. 116:3 – 118:8.

Based on a post-crash inspection of the lift detector, the Government's expert witnesses opined that an internal mechanism was inoperable, essentially preventing the lift detector horn from sounding. Tr. 759:3-7; 763:5-19; 864:14 – 866:9.

## C.    The Civil Air Patrol

The Civil Air Patrol ("CAP") is an auxiliary of the United States Air Force. It has three primary missions: (1) lend support for emergency services, (2) conduct aerospace education programs, and (3) operate a youth cadet program. Tr. 272:9-13.

On the day of the accident, CAP officers were performing glider flights as part of CAP's youth cadet and aerospace education missions. Tr. 286:16 – 287:2; 398:4-7. Those glider operations qualified as missions assigned by the United States Air Force. [151] at 31.

Glider operations involve a tow plane, a glider, and a ground crew to prepare both aircraft for launch. The glider used was a Blanik Glider Model L23, and it was towed by a Cessna 172 ("CAP 172"). The glider is

equipped with two seats; typically a CAP pilot sits in the rear seat while a CAP cadet sits in the front. Tr. 487:11-15.

### D.    LaGrange-Callaway Airport

LaGrange-Callaway Airport, located in Troup County, Georgia, has two intersecting runways. Runway 13/31, the main runway, intersects runway 3/21 at an approximately 80-degree angle.[3] The airport features multiple taxiways for airplanes and other vehicles, most prominently taxiway Sierra, which runs diagonally from the south end of runway 3/21, across runway 13/31, to several airplane hangars.



---

[3] The runway designations correspond to the magnetic headings of the runway direction. Plotted on a compass, runway 13/31 is roughly aligned with 130 degrees at one end and 310 degrees at the other. Similarly, runway 3/21 is roughly aligned with 30 degrees at one end and 210 degrees at the other.

The line-of-sight from each end of runway 13/31 to each end of runway 3/21 is obstructed by hills, trees, and buildings at the airport. This means that planes taxiing at the end of either runway, or flying low over the end of either runway, cannot directly see the end of the intersecting runway. Nonetheless, it is undisputed that the airport is compliant with all applicable FAA line-of-sight requirements. Tr. 47:20 – 48:2.

Lagrange-Callaway is an uncontrolled—or nontowered—airport, meaning there is no air-traffic control tower providing instructions to pilots. Instead, pilots coordinate with one another by radio on a Common Traffic Advisory Frequency ("CTAF").[4] Pilots also must abide by FAA regulations and are guided by local and regional rules.

Lagrange-Callaway has a published set of local rules of glider operations. The rules require glider operators to file a Notice to Airmen ("NOTAM") advising pilots of planned glider operations. The rules also require glider operators to use a spotter who can warn of possible traffic

---

[4] No recording of the CTAF communications exists from the day of the crash.

conflicts with other aircraft at the airport. Tr. 11:20 – 12:6. The spotter should be positioned with an unobstructed view of both ends of both runways. Finally, the local rules prohibit launching a glider from runway 3/21 if it is known that a powered aircraft within five miles of the airport is approaching runway 13/31 for landing. Tr. 884:1-11. The local rules are available on the airport's website, but are not published as part of any official FAA publication.

### E.   Events Preceding the Crash

The weather conditions on February 22, 2014 at Lagrange-Callaway were clear, with no obstruction to visibility. Tr. 261:14-25; 345:15-19. In the morning and early afternoon, CAP conducted between eight and twelve glider flights for the CAP cadets. CAP did not file a NOTAM concerning glider operations, nor did it use a spotter. Tr 12:2-6. The pilots in CAP 172 and the glider communicated with each other by radio over the CTAF. Tr. 240:17-23.

In the early afternoon, Joel Seidband, a retired Air Force Lieutenant Colonel and CAP pilot, went to the Fixed Base Operation

("FBO"),[5] where CAP 172 was being refueled, to begin preparing for further glider flights. He saw the Baron being refueled and exchanged pleasantries with one of the Baron's occupants.[6] After performing a pre-flight check, Seidband taxied CAP 172 to the end of runway 3/21.

The Baron took off from runway 13/31, with Rossetti in the front left seat and Lutz in the front right. [151] at 31. The front left seat is typically the pilot's seat. Tr. 613:19-25. Curtis was seated in the rear left seat. [151] at 31.

Shortly thereafter, CAP 172 and the glider took off on runway 3/21. Seidband was pilot-in-command of CAP 172, and Pete Schulz, also a retired Air Force Lieutenant Colonel and CAP pilot, was pilot-in-command of the glider. [151] at 31. David Mitchell, a CAP flight instructor and pilot, was seated in the rear seat of the glider as a passenger. CAP 172 and the glider completed a successful flight practicing a simulated rope-break. CAP 172 and the glider then

---

[5] The FBO building contains the airport's offices, pilot lounge, fuel stations and other support facilities.

[6] Seidband could not recall if he spoke with Curtis, Lutz or Rossetti. Tr. 238:18-25; 288:16 – 289:2.

returned to the south end of runway 3/21 to set up for another flight. Tr. 291:7 – 292:22.

Shortly after 2:00 P.M. the Baron was configured to land on runway 13/31 at the airport. [151] at 31.

### F.    Testimony[7] Regarding the Crash Sequence

### 1.    Charles Kenyon, Jr.

Charles Kenyon, Jr., an airplane mechanic, was working in a hangar adjacent to the FBO and to runway 13/31. He saw the Baron refueling at the FBO before takeoff. He later heard the Baron broadcast on the CTAF that it was going to do a simulated instrument approach on runway 13/31. Tr. 82:12 – 83:3. He did not hear any announcements of a planned takeoff on the CTAF. Tr. 83:3-7.

With his back to the runway, Kenyon heard aircraft engines going to full power, which he noticed because it was unusual. Tr. 83:8-18; 91:12-15. He turned around and saw the Baron about one foot above

---

[7] The summaries in this section reflect the testimony of the witnesses and not the Court's factual findings.

runway 13/31 with its landing gear down. The Baron was near the intersection of runway 13/31 and taxiway Sierra. Tr. 91:16-20.

Kenyon watched the Baron pitch up, climb to between 100 and 150 feet, roll over to the left, and crash nose down, just south of the runway intersection. During this time, he also saw CAP 172 and the glider on runway 3/21 approaching the intersection with runway 13/31 from the left. When he first saw the glider it was airborne. Tr. 94:22 – 95:2. He saw CAP 172 continue through the intersection, without stopping, after the Baron crashed. 83:19 – 84:18; 95:3-6. The glider was able to stop before the intersection. Tr. 83:19 – 84:6; 87:3-7.

### 2.  Mark Lott

Mark Lott, a pilot and Columbus State University police officer, was in the FBO lounge. He heard an aircraft announce on the CTAF that it was inbound for a landing on runway 13/31. Tr. 102:11-22. A short time later, he saw the Baron descending near the east end of runway 13/31 with its landing gear down. He did not hear any announcements of a planned takeoff on the CTAF. Tr. 103:2-5; 107:13-16.

While the Baron was over the runway, Lott heard someone call, "Abort, Abort" over the CTAF, but did not know who made the call. Tr. 106:1 – 107:6. He then heard the Baron increase power to its engines and saw the Baron begin to climb. The Baron then pitched over to the left and crashed in the grass to the south of runway 13/31 and to the east of runway 3/21. Lott saw the Baron crash, but he never saw CAP 172 or the glider.

### 3.   Seidband

Seidband was in the pilot's seat of CAP 172 at the south end of runway 3/21. From this position he could not see either end of runway 13/31. Tr. 205:14 – 206:13. He made a radio call on the CTAF announcing that he was departing on runway 3/21 with the glider in tow. He did not hear the Baron or any other aircraft transmit on CTAF in the time before he began his take-off roll. Tr. 296:19 – 297:4. He began accelerating down runway 3/21.

When Seidband cleared the line-of-sight obstructions between the runways, he looked to his right and saw the Baron over runway 13/31, approaching the runway intersection. Tr. 298:25 – 299:3. He was

surprised to see the Baron. Tr. 215:6-10. He estimated that at that moment CAP 172 was 1000 to 1500 feet down runway 3/21, and that the Baron was between 50 to 100 feet above runway 13/31. Tr. 303:11-15; 306:3 – 307:8. Siedband believed there was a "potential of a conflict" with the approaching Baron that could lead to a collision. Tr. 207:18-21; 208:5-8. For this reason, Seidband took immediate action and called, "abort, abort, abort" on the CTAF. Tr. 299:16-17.

Seidband pulled back on CAP 172's power and steered the aircraft to the far left side of runway 3/21 while applying the brakes. He also released the tow rope. He stopped CAP 172 just short of the intersection with runway 13/31. Tr. 216:2-15; 220:16-21. He saw the Baron approximately 100 to 200 feet in the air, whereupon it turned to its left, flipped over, and crashed. Tr. 302:9-20.

After the crash, Seidband called for emergency assistance on the CTAF and turned CAP 172 around, ultimately parking the plane on the far left side of runway 3/21.

### 4.    Schulz

Schulz was in the front seat of the glider at the south end of runway 3/21. He heard Seidband announce their departure on the CTAF. Tr. 357:21 – 358:3.

During takeoff, Schulz heard Seidband call for an abort. Tr. 359:2-15. When Seidband released the tow rope, the glider was airborne a few feet above the runway. Schulz deployed the glider's speed brakes, and the wheels soon touched the runway. Schulz applied the brakes and focused on avoiding collision with CAP 172. Tr. 360:16 – 361:10. He maneuvered the glider to the far right side of runway 3/21.

At this point Schulz was approximately 1000 to 1500 feet from the end of runway 3/21 and still attempting to stop the glider. He looked up to his right and saw the Baron pitch up, roll over, and then pass behind him out of view; Schulz did not see the Baron crash. The glider stopped before the intersection with runway 13/31.

## G.    Curtis's Injuries and Treatment

After the Baron crashed, paramedic Emily Horton and Life Flight R.N. Kelly Gleason arrived at the scene. They could not approach the Baron until firefighters finished extinguishing the burning engine fuel.

Horton was the first medical professional to reach the plane. She immediately assessed that Rossetti and Lutz were no longer alive. However, Curtis was alive, though severely injured: he had multiple bone fractures in his arms and legs, extreme facial injuries, and was covered in blood. Nonetheless, he had a pulse and was taking shallow, sporadic breaths. Horton attended to Curtis as he was removed from the Baron and prepared for an evacuation by helicopter.

During this time, Curtis never moaned, screamed, or called out in any way. Tr. 159:1-12. His eyes remained shut—though his facial injuries would have prevented him from opening his eyes even if he had consciously tried to. Tr. 171:16-23. While being transported to a backboard, Curtis's chest and shoulders rose off of the board, and he coughed out blood before falling back on the board. Tr. 149:19 – 150:17.

When attending to the multiple fractures in Curtis's legs, Curtis lifted his left leg and bent it at the knee. Tr. 151:12–23.

Gleason also saw Curtis's left leg move, which she characterized as "distinct" and not "reflexive." Tr. 166:3-20. She attended to Curtis while he was in the helicopter, but did not see him make any other movements.

Curtis died approximately two and a half hours after the crash at Columbus Regional Midtown Medical Center. [151] at 31.

Horton and Gleason recorded their periodic observations of Curtis. These observations included scoring Curtis on the Glasgow Coma Scale, which is a tool used to gauge a patient's level of consciousness. Higher scores correspond to stronger indications of consciousness, while a score of eight or less is considered unresponsive and is consistent with being in a coma. Tr. 156:24 – 157:1. Horton initially scored Curtis a five on the scale before downgrading him to a three, the lowest possible score. Tr. 157:2 – 158:17. In all remaining recordings, Horton and Gleason scored Curtis a three. Tr. 173:25 – 175:10.

## H.     The Court's Findings Regarding the Crash

Based on a review of the evidence and testimony submitted during trial, the Court finds the following regarding contested factual issues relating to the crash:

### 1.     The Lift Detector Was Not Defective

The lift detector on the Baron was not defective. The Government argues that a post-crash inspection of the lift detector revealed the inability of an internal switch to properly close an electric loop. Thus, the Government argues, from the time it was installed in 1996 through the time of the crash, it was impossible for the lift detector to function during flight.[8] However, this conclusion is belied by the multiple witnesses who testified that they had heard the lift detector function properly.

Thaxton performed maintenance on the Baron and testified that the lift detector functioned properly during every annual inspection,

---

[8] *See* Tr. 776:10-14 (testimony of Defendant's mechanical expert, William Baumheuter) ("Q: So it is your opinion that the lift detector that was in Dr. Curtis's Baron had never ever worked, not once, never, not intermittently ever since 1996? That was your testimony at your deposition. Do you remember stating that? A: My opinion is that the only way it would work is if you applied an excessive amount of pressure lifting on the switch."); [225] at ¶132 ("The defect existed since the lift detector's installation.").

including the inspection seven months before the crash. *See* Tr. 128:21-23. Karen Curtis and James Wisner, who were passengers in the Baron multiple times, testified that they heard the distinct lift-detector horn sound immediately before the plane landed. In short, the Court does not believe that the lift-detector was defective.

### 2.    Rossetti Was Piloting the Baron

Rossetti was piloting the Baron at the time of the crash. The Government contends that Lutz, who was in the front right seat, could have been piloting the Baron.[9] While the Baron is equipped with flight instruments for both front seats, *see* Tr. 614:13–20, the pilot-in-command typically sits in the front left seat. Rossetti was sitting in that seat. The Government's position is mere speculation; no competing evidence shows that Lutz, or anyone else, was piloting the Baron. *See* Tr. 484:11-25.

---

[9] At the time of the crash, Lutz was qualified as a flight instructor, but medically disqualified from operating the Baron as a pilot. *See* Tr. 627:24 – 628:21; 1050:15 – 1051:10.

### 3.    Only the Baron Announced Its Activity

The Baron made a call on the CTAF that it was preparing for a landing on runway 13/31. This radio call was confirmed by Kenyon and Lott, the only two disinterested witnesses to the crash. The CAP pilots either did not hear or failed to appreciate the Baron's announcement over the CTAF that it was preparing to land.

Similarly, neither Kenyon nor Lott heard an announcement on the CTAF that the CAP aircraft was preparing for a glider flight, and the Court concludes that it is more likely than not that such a call was not made.

### 4.    The Cause of the Crash

The Court finds that the presence of the CAP aircraft approaching the runway intersection caused the crash. While the Court cannot avail itself of testimony from any person in the Baron at that time, Kenyon and Lott's testimony establish that the Baron suddenly increased to full power seconds before it would have touched down, and in a position from where Rossetti would have first been able to observe the approaching CAP aircraft. The most—if not only—logical conclusion is

that Rossetti saw the CAP aircraft and made an attempt to avoid a collision. This maneuver by Rossetti, while the Baron was configured for landing, ultimately led the Baron to pitch up sharply, stall, roll over, and then crash.

The parties' expert witnesses and accident reconstructionists provided ample competing testimony on whether the aircraft actually would have collided at the runway intersection if neither pilot had altered course. Based on this testimony, the Court is satisfied that the aircraft would have at least been dangerously close to one another while moving at high speeds. Moreover, Rossetti did not have the luxuries of time and detachment that the expert witnesses enjoyed when estimating whether a collision would have occurred; he had "one bite at the apple." Tr. 584:7-18.[10] At the moment Rossetti first saw the CAP aircraft, it would have been clear to him that immediate action was needed to avoid a potential collision.

---

[10] *See also* Tr. 585:9-12 (testimony of Plaintiffs' pilot expert, Col. Peter Field) ("When I said he had one bite at the apple, he had this one glimpse of an impending collision, and after that he can't modify what he has done. He has committed to it, and stuck with it.").

### 5.    Curtis Did Not Suffer After the Crash

Finally, the Court concludes that Curtis was not conscious following the crash. First, Plaintiffs were not able to adduce any evidence that Curtis was conscious between the time of the crash and when medical help arrived. Curtis suffered severe injuries during the crash—including serious injuries to his head and face—which were sufficient to cause him to lose consciousness. The few facts that might evince consciousness—his leg movement and his sitting up to cough blood—are consistent with the capabilities of an unconscious person[11] and do not outweigh the convincing testimony of Horton and Gleason that Curtis remained unresponsive and otherwise showed no signs of consciousness. Thus, the Court concludes that Curtis was not conscious following the crash, and that he never regained consciousness.

---

[11] *See* Tr. 157:18 – 158:17 (testimony of paramedic Horton) ("A: From the way that he appeared to me, in that movement, it was almost—it was kind of like a sympathetic nervous system reflex. . . . Like even someone unresponsive, your body is going to tell you when it's in distress, meaning he had a lot of blood in his airway, and his body knew that he was unable to breathe. Q: It did not indicate to you any level of consciousness? A: It did not.").

## II.    Conclusions of Law

### A.    Venue and Jurisdiction

"The United States cannot be sued except as it consents to be sued." *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993). "[T]he FTCA waives the government's sovereign immunity for tort claims based on the acts or omissions of 'any employee of the Government while acting within the scope of his office or employment.'" *Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690, 701 (11th Cir. 2014) (quoting 28 U.S.C. § 1346(b)(1)).

The Government has stipulated that at the time of the crash Seidband, Mitchell, and Schulz were conducting CAP flights as part of a United States Air Force assigned mission. [151] at 31.

This Court has jurisdiction, and venue is proper pursuant to 28 U.S.C. §§ 1346(b)(1) and 1402(b).

### B.    Georgia Negligence Law

Defendant's liability under the FTCA turns on whether "the United States, if a private person, would be liable to the [plaintiff] in accordance with the law of the place where the act or omission

22

occurred." 28 U.S.C. § 1346(b)(1). All parties agree that because the alleged tortious acts occurred in Georgia, the law of Georgia governs the conduct of the United States in this instance.

To prevail on a negligence claim under Georgia law, a plaintiff must prove four elements by a preponderance of the evidence:

(1)     A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm;

(2)     A breach of this standard;

(3)     A legally attributable causal connection between the conduct and the resulting injury; and

(4)     Some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Galanti v. United States*, 709 F.2d 706, 708–09 (11th Cir. 1983) (quoting *Bradley Ctr. v. Wessner*, 296 S.E.2d 693, 695 (Ga. 1982)). "The mere fact that an accident happened and the plaintiff may have sustained injuries or damages affords no basis for recovery against the defendant unless the plaintiff carries the burden of proof" as to each of these elements. *Brown v. Kirkland*, 134 S.E.2d 472, 475 (Ga. Ct. App. 1963).

### C.   CAP's Negligence

"In aviation cases, the law is that '[l]iability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care.'" *Daley v. United States*, 792 F.2d 1081, 1085 (11th Cir. 1986) (quoting *United States v. Schultetus,* 277 F.2d 322, 325 (5th Cir.), *cert. denied,* 364 U.S. 828 (1960)). In Georgia, the duty owed by a defendant includes both a common law duty to exercise reasonable care and any other duty imposed through legislative enactment. *Diamond v. Dep't of Transp.*, 756 S.E.2d 277, 281 (Ga. Ct. App. 2014); *accord Zinn v. United States*, 835 F. Supp. 2d 1280, 1322–24 (S.D. Fla. 2011) (applying both Federal regulations and state common law to evaluate negligence of aircraft pilot).

Pilots at nontowered airports have a duty to follow applicable FAA regulations and rules. Crucial to this case, FAA regulations provide that aircraft "while on final approach to land or while landing, have the right-of-way over other aircraft in flight or operating on the surface . . . ." 14 C.F.R. § 91.113(g). Moreover, all pilots are expected to maintain

vigilance and "see and avoid" other aircraft in operation. *Id.* § 91.113(b); *see also* Tr. 1021:13-21.

The local rules of Lagrange-Callaway Airport require during glider operations the use of a spotter who has an unobstructed view of both ends of both runways so that he can warn of possible traffic conflicts. Tr. 11:20 – 12:6. The rules also prohibit glider takeoffs when an aircraft is known to be on a landing approach within five miles of the airport. *See supra* Part I.D. The parties stipulated that CAP knew those rules existed and did not follow them, *see* Tr. 11:20 – 12:17, but the Government contests whether these rules applied to the CAP flights.

The Court finds that CAP breached its duty in its glider operations at Lagrange-Callaway. It neglected a risk of collision by failing to use a spotter despite the obstructed views between the runways. Such a duty to make its flight operations safe existed irrespective of the applicability of the local airport rule requiring a spotter during glider operations. The CAP pilots failed to yield the right-of-way to the Baron, as required by 14 C.F.R. § 91.113(g). And as previously discussed, *see supra* Part I.H., the CAP pilots apparently did

not announce their flight plans over the CTAF, and they either did not hear or failed to appreciate the Baron's announcement over the CTAF that it was preparing to land. In these ways CAP breached the duty of all pilots to generally act with reasonable care, and specifically to cede the right-of-way to landing aircraft.

CAP's breach of duty caused the Baron crash. Kenyon and Lott's testimony establish that just before the Baron would have touched down, its engines suddenly increased to full power. At that time, the Baron was in a position from which Rossetti would have first been able to observe the CAP aircraft approaching from the left. The Court concludes from this evidence that Rossetti saw the CAP aircraft and made an attempt to avoid a collision. This maneuver by Rossetti, while the Baron was configured for landing, ultimately caused it to pitch up sharply, stall, roll over, and then crash. *See supra* Part I.H. Thus, the crash was a direct result of the CAP aircraft's presence on runway 3/21, which itself was a result of a breach of duty by CAP.

Finally, it is uncontroverted that the injuries suffered by Plaintiffs' decedent were caused by the crash of the Baron. While the

extent of those damages will be discussed in further detail, the Court concludes that CAP was negligent under Georgia law and is thus liable under the FTCA claim.

### D.   Comparative Negligence

Georgia follows the law of modified comparative negligence. O.C.G.A. § 51-12-33(d)(1); *see Cavalier Convenience, Inc. v. Sarvis*, 699 S.E.2d 104, 106–08 (Ga. Ct. App. 2010) (discussing 2005 amendment to O.C.G.A. § 51-12-33). This means that the Government is liable only for its proportional share of fault. *See Alston & Bird LLP v. Hatcher Mgmt. Holdings, LLC*, 785 S.E.2d 541, 543 (Ga. 2016) (holding that the trier of fact is required to consider the fault of all parties who contributed to the alleged injury, including plaintiffs and non-parties when only a single defendant is sued).

The Government first argues that Curtis was partially responsible for the crash because he was negligent in maintaining the aircraft. It alleges that the lift detector, which would have warned that the airplane was stalling, was not functioning. The Court rejects this argument, as the evidence does not establish that the lift detector was

27

defective and the Court finds that it was not. *See supra* Part I.H. Hence, it could not have been a contributing factor to the crash.

The Government next argues that Rossetti is at least partially responsible for the crash because a pilot of ordinary skill exercising reasonable care and facing the same situation would have successfully performed a balked landing[12] procedure and avoided the CAP aircraft without crashing. In support of this argument, the Government offered expert witnesses who testified to the routine nature of a balked landing, and an accident reconstructionist who testified that Rossetti could have avoided the flight path of the CAP planes using the balked landing procedure. *See* Tr. 879:11-22; 1010:10 – 1011:11; 1014:6-25.

Plaintiffs' experts disagreed with the Government's experts, and instead testified that a pilot of ordinary skill and training could not reasonably be expected to pull off a balked landing under these circumstances. *See* Tr. 568:2 – 571:18; 572:17 – 576:17. After considerable reflection, the Court finds the testimony of both sets of experts persuasive.

---

[12] Different witnesses referred to this same concept as a "balked landing," a "go around," and a "missed approach." *See* Tr. 612:10-25.

The Government's experts testified convincingly that on any approach an actual landing is merely one option and that the pilot should be prepared to abort and fly around if needed. But, as Plaintiffs' experts testified, that doesn't mean that the circumstances of every approach provide the pilot an opportunity for a successful balked landing. And the Court finds that this is the type of situation that confronted Rossetti: he had very little time to contemplate making a balked landing and did not have enough time to successfully execute such a maneuver. *See* Tr. 1099:19-25 (opinion of Plaintiffs' accident-reconstruction expert Kas Osterbuhr that Rossetti "had a couple [of seconds], at best, to see what was happening").

Moreover, the comparative negligence of a plaintiff or non-party is excused if the conditions of the sudden emergency doctrine are met. Under that doctrine, a person who is faced with a sudden emergency and either acts within his "best judgment" or does not have sufficient time to form such a judgment is "not chargeable with negligence." *Willis v. Love*, 502 S.E.2d 487, 489 (Ga. Ct. App. 1998). An emergency is defined as a "'sudden peril caused by circumstances in which the

[person] did not participate and which offered [him] a choice of conduct without time for thought so that negligence in [his] choice might be attributable not to lack of care but to lack of time to assess the situation.'" *Id.* (citing *Luke v. Spicer*, 390 S.E.2d 267, 268 (Ga. Ct. App. 1990)). The Court finds that Rossetti was faced with precisely such a situation.

Cases involving application of the sudden emergency doctrine to automobile accidents are illuminating. For instance, the doctrine was applied when a car cresting a hill suddenly came across a cluster of emergency vehicles and hydroplaned while trying to brake. *Willis*, 502 S.E.2d at 488–89.

However, courts have denied application of the sudden emergency doctrine where a person had no ability to act between the onset of the sudden emergency and a collision. *See Rayfield v. Farris*, 558 S.E.2d 748, 749 (Ga. Ct. App. 2002) (denying sudden emergency doctrine where "in the brief period between the failure of the brakes and the collision, [Defendant] had [no] option but to hit the pickup truck").

Here, Rossetti was performing an ordinary landing when he suddenly saw approaching aircraft on an intersecting runway. The peril posed by the situation was amplified by the fact that there were two approaching aircraft, CAP 172 and the glider, and the glider was already airborne. The aircraft were rapidly approaching each other and were close enough to spell grave peril for all. *See supra* Part I.H. While Rossetti *may* have heard Seidband make an abort call over the CTAF, there is no evidence that he was familiar with CAP's abort procedures.

Thus, Rossetti was faced with a grave and sudden peril that he did not create, and he had mere seconds to avoid an imminent disastrous collision. CAP's negligence put him in that impossible situation. Any attempt after-the-fact to point a finger at Rossetti is unfounded, and his actions under these trying conditions are protected by the sudden emergency doctrine. Accordingly, Rossetti is not responsible for any portion of the crash.

The Government has not pointed to any other actors who may have contributed to the crash. Thus, the Court concludes that the Government is fully liable for any damages caused by CAP's negligence.

### E.   Damages

Damages are recoverable only when they are "the legal and natural result of the act done." O.C.G.A. § 51-12-9. "In all cases, necessary expenses consequent upon an injury are a legitimate item in the estimate of damages." O.C.G.A. § 51-12-7.

In a wrongful death suit, Georgia law allows a surviving spouse to recover "the full value of the life of the decedent." O.C.G.A. § 51-4-2(a). "The full value of the wrongfully ended life 'consists of both the economic value of the deceased's normal life expectancy as determined by his expected lifetime earnings,' as well as non-economic factors 'incapable of exact proof' or even exact definition." *Baragona v. Kuwait Gulf Link Transp. Co.*, 688 F. Supp. 2d 1353, 1355 (N.D. Ga. 2007) (quoting *Dep't of Human Resources v. Johnson,* 592 S.E.2d 124, 131 (Ga. Ct. App. 2003)).

As a surviving spouse, Karen Curtis has brought claims for the value of her husband's life, both economic and noneconomic. Plaintiff Rupenthal, on behalf of the Curtis estate, brings claims for medical and

funeral expenses, Curtis's pre-impact pain and suffering, and post-impact pain and suffering.

### 1.   Medical and Funeral Expenses

By statute, medical and funeral expenses can be recovered by the decedent's estate on a wrongful death claim. O.C.G.A. § 51-4-5(b).

The parties initially stipulated that the medical expenses incurred were $51,395. *See* [151] at 32. However, at trial the parties agreed that this figure reflected a transposition error: the bill from the Columbus Medical Center was listed as $12,718.33, but the actual expense was $21,718.33. *See* Tr. 451:2-13. Taking this agreed upon correction into account, the true amount of medical expenses was $60,395.

It is uncontroverted that the funeral expenses incurred by the Curtis estate were $16,689.14.

### 2.   Pre-Impact Pain and Suffering

The estate of a decedent may recover for any pain and suffering, including emotional distress, that the decedent experienced prior to death. O.C.G.A. § 9-2-41; *Monk v. Dial*, 441 S.E.2d 857, 859 (Ga. Ct. App. 1994) ("The fright, shock, and mental suffering experienced by an

individual due to wrongful acts of negligence will authorize a recovery where attended with physical injury."). The amount of damages for such pain and suffering is determined by the fair and enlightened conscious of the factfinder. *Monk*, 441 S.E.2d at 859.

The Curtis estate makes claims for Curtis's pain and suffering both before and after the Baron crash. As to pre-impact pain and suffering, the Government contends that there is insufficient evidence that Curtis suffered any emotional distress prior to the crash. However, under Georgia law, even where there is no direct evidence establishing the decedent's mental state, a fact-finder can "infer that [the] decedent was aware of [an] impending crash, and from these circumstances [can] extrapolate the probable mental state of [the] decedent in that last moment of consciousness." *Id.*; *see also Dep't of Transp. v. Dupree*, 570 S.E.2d 1, 11 (Ga. Ct. App. 2002).

Here, the uncontroverted evidence is that Curtis was an experienced pilot who was deeply familiar with the Baron. Such a person would understand that something was terribly wrong during the landing approach when the plane increased power and pulled up

sharply and to the left. Such a person would also understand what was happening in the aircraft when it stalled, and would understand the near certainty of a crash at that time. Sadly, such a person would know that he was about to be severely injured or killed. In those few seconds,[13] Curtis would have gone from hopeful that a collision had been avoided to pure dread as the aircraft stalled and approached the ground.

In light of Curtis's deep familiarity with operation of the Baron and the fright, shock, and terror he must have experienced in the seconds leading up to the crash, the Court concludes that Curtis suffered pre-impact pain and suffering in the amount of $100,000.

### 3.   Post-Impact Pain and Suffering

As previously discussed, *see supra* Part I.H., the evidence does not establish that Curtis was conscious following the crash. Therefore the Curtis estate cannot recover for post-impact pain and suffering. *See Walker v. Daniels*, 407 S.E.2d 70, 75–76 (Ga. Ct. App. 1991) (holding

---

[13] Kenneth Orloff, the Government's accident reconstructionist, testified that a reasonable estimate for the time between when the Baron stalled and when it hit the ground was three to four seconds. Tr. 823:23 – 824:13.

that questions of consciousness, as required for award of damages for pain and suffering, are a matter for the trier of fact to decide).

### 4.   Economic Damages

The parties offered competing computations of economic damages based on Curtis's expected future income.

First, the parties differed on whether to use Curtis's 2013 income as a base-line for expected future income, or a pro-rated extrapolation of his pre-death 2014 income (the crash occurred in February 2014). Plaintiffs argue that the pro-rated 2014 income is more accurate because it reflects a new income source: a profit-sharing contract with Emory Healthcare.

While it is likely that the contract with Emory Healthcare would have had an impact on future earnings, it is too speculative for the Court to base future earnings on less than two months' worth of income in 2014. Instead, the full-year income from 2013, which partially captures the Emory Healthcare contract, is a better baseline from which the Court can project future earnings.

Next, the parties argue over Curtis's projected retirement age. The Government's expert estimated a retirement age of 68, based on work expectancy data from the census bureau and the Bureau of Labor Statistics. Tr. 1131:25 – 1133:9. Plaintiffs argue that based on Curtis's particular love of his profession, a more accurate retirement age would be 70. The Court is mindful of Karen Curtis's testimony that he "never wanted to retire." Tr. 739:24 – 740:11. However, the Court concludes that a retirement age of 70 is too speculative, and will instead apply the average retirement age of 68, as argued by the Government.

Finally, the parties differ on the discount rate to apply to future earnings. Plaintiffs' expert argued that a 2.07 percent rate was appropriate based on market conditions, *see* Tr. 667:5-8, while the Government insisted that the statutory rate of five percent should be applied, *see* O.C.G.A. § 51-12-13. The Court is allowed to apply whatever discount rate it deems appropriate. *See* O.C.G.A. § 51-12-13(a) ("[T]rier of fact may reduce [damages] to the present value based on a discount rate of 5 percent or any other discount rate as the trier of fact may deem appropriate."). Based on an independent review of the

arguments presented by the expert witnesses, the Court will apply a three-percent discount rate.

Using the 2013 baseline salary, an expected retirement age of 68, and a three-percent discount rate for future earnings, the total amount of economic damages is $8,797,609.[14]

### 5.   Noneconomic Damages

In computing noneconomic damages, the Court must assign value to the intangible aspects of Curtis's life, from his perspective. *See Brock v. Wedincamp*, 558 S.E.2d 836, 841 (Ga. Ct. App. 2002). Georgia courts routinely look to the decedent's character, familial relationships, interests and abilities in determining the value of his life. *See Jones v. Livingston*, 416 S.E.2d 142, 146–47 (Ga. Ct. App. 1992) (allowing evidence of decedent's family relationships, interest in baseball, singing ability, and religious activities); *Consol. Freightways Corp. of Del. v. Futrell*, 410 S.E.2d 751, 752 (Ga. Ct. App. 1991) (attempting to measure "a parent's society, advice, example and counsel" by looking to "the character and family circumstances of the decedents, and . . . of the

---

[14] *See* [234 & 235].

decedents' relationships with their respective children); *cf. Miller v. Jenkins*, 412 S.E.2d 555, 556 (Ga. Ct. App. 1991) ("The intangible factors which supplement the economic value to comprise 'full value of the decedent's life' elude precise definition."). This inquiry is guided by the Court's "experience and knowledge of human affairs" and is governed by the Court's "enlightened conscience." *Futrell*, 410 S.E.2d at 753.

Some comparator cases help give clarity to this inquiry. In *Lindsey v. Navistar International Transportation Corp.*, 150 F.3d 1307, 1309 (11th Cir. 1998), a thirty-year-old woman was killed in an automobile accident. At trial, plaintiff adduced testimony that the decedent was a "bright, vibrant and talented woman in the prime of her life, who was well-liked by her friends and relatives. The witnesses described the loving relationships between [decedent] and her husband and [decedent] and her two young sons, ages two-and-a-half and four months—two boys who will grow up without ever really knowing their mother." *Id.* at 1319. The Eleventh Circuit ultimately upheld an award of $5,000,000 for the noneconomic value of the decedent's life. *Id.*

In *Futrell*, 410 S.E.2d at 752–53, a husband and wife were both killed in an automobile accident. Taking account of "the character and family circumstances of the decedents, and . . . of the decedents' relationships with their respective children," the Court of Appeals of Georgia upheld awards of $1,000,000 and $800,000. *Id.* at 753.

Similarly, in *TGM Ashley Lakes, Inc. v. Jennings*, 590 S.E.2d 807, 819–20 (Ga. Ct. App. 2003), the Court of Appeals of Georgia upheld an award of $1,800,000 following the death of a "young mother [who] was engaged to be married, had other family, and was looking forward to a long life."

Plaintiffs also point the Court to recent state-court trial awards of $4,000,000 for the noneconomic value of the life of a twenty-one-year-old teacher and $8,000,000 for a twenty-four-year-old pre-law student. *See* [226] at 41–42.

This task of quantifying the noneconomic loss sustained by Dr. Curtis is the most challenging. Balancing the relevant law, as well as Dr. Curtis's esteemed standing in the community as a doctor, his love of flying and other outdoor activities, and especially his familial blessings

40

and the loss of the golden years of his life, the Court awards

noneconomic damages in the amount of $3,000,000.

## III.   Conclusion

For the foregoing reasons, the Clerk is directed to enter Judgment

in favor of Plaintiff Robert Rupenthal and against the United States in

the amount of $177,084.14. The Clerk is further directed to enter

Judgment in favor of Plaintiff Karen J. Curtis and against the United

States in the amount of $11,797,609. The Clerk shall then close this

case.

IT IS SO ORDERED this 3d day of August, 2017.


Timothy C. Batten, Sr.
United States District Judge